COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS


| | | |
|---|---|---|
| JAMES E. WHITE, IV, Individually and as Beneficiary of the JANE WHITE TRUST; MARTI WHITE WRIGHT, Individually and as a Beneficiary of the JANE WHITE TRUST; and CLINTON WESLEY WHITE, Individually and as a Beneficiary of the JANE WHITE TRUST, by and through his Next Friend, JAMES E. WHITE, IV and JAMES WHITE, III, Individually and as TRUSTEE of the JANE WHITE TRUST, | § § § § § § | No. 08-23-00243-CV Appeal from the 394th Judicial District Court |
| Appellants, v. | § § | of Presidio County, Texas |
| EDWARD McMINN WHITE, Individually and as Trustee of the EDWARD McMINN WHITE TRUST, and BEAUREGARD BRITE WHITE, Individually and as Trustee of the BEAUREGARD BRITE WHITE TRUST and SUSAN COMBS, Temporary Interim Trustee of the WHITE DIVISION TRUSTS. | § § § § | (TC# 7856A) |
| Appellees. | § | |

# **O P I N I O N**

This appeal involves a protracted dispute between siblings over the administration of a trust named after their mother, Jane White, the primary asset of which is the Brite Ranch (the Ranch) in West Texas. The White Trust currently has four primary income beneficiaries: Appellee James White, III (Jim), who was appointed as trustee in 2010; his two brothers Edward McMinn White

(Mac) and Beauregard Brite White (Beau), who are the Appellees; and his sister, Hester Ann White Tyler (Hester Ann), who did not join the suit but was considered a nominal party in these proceedings.[1] In 2018, Mac and Beau sued Jim, alleging Jim breached his fiduciary duties as trustee by failing to act as a prudent investor and by failing to make any income distributions. They further alleged Jim engaged in self-dealing by employing himself and his family to work on the Ranch without disclosing his contract and by paying himself and his family excessive compensation.

After a jury found that Jim had breached his fiduciary duties to the beneficiaries, the trial court entered a "Final Judgment Nunc Pro Tunc," awarding a million dollars in damages to "the trustee of the [White] Trust" for the "loss or depreciation in value" of the White Trust estate. In addition, the trial court awarded Mac and Beau $1.5 million each in exemplary damages, in their capacity as income beneficiaries of the White Trust. The trial court removed Jim as trustee due to the breach of fiduciary duties and made several modifications to the White Trust, including dividing it into four separate "Division Trusts" to be administered by each of the siblings, giving them each an undivided interest in the Ranch and the ability to partition and sell their interests in the same.

Prior to the trial court entering the Final Judgment Nunc Pro Tunc, three of Jim's children, James White IV (Cuatro), Clinton Wesley White (Clint), and Marti White Wright (Marti)—contingent remainder beneficiaries of the White Trust—intervened in the proceedings (the Intervenors) and filed multiple post-judgment pleadings seeking a new trial, as did Jim. The trial court later struck the Intervenors' petition and denied all other pending motions. Both Jim and the Intervenors appealed from the final judgment.

---

[1] In addition, the Brite Divinity School and the First Christian Church of Marfa were served in the proceeding and were also named as nominal parties in the litigation as other income beneficiaries.

For the reasons set forth below, we hold that fundamental error in the jury charge requires us to reverse the trial court's final judgment and grant a new trial.

## I. FACTUAL BACKGROUND

### A. The Brite Trust

Beginning in 1885, Luke Brite began amassing land in a remote area of West Texas, which became known as the Brite Ranch. At the time of his death in 1941, the Ranch consisted of approximately 125,000 acres, with a closed herd of prize-winning cattle roaming the land. He left the Ranch to his wife, Edward "Eddie" Brite, who subsequently passed away in 1963. In her Last Will and Testament (the Will), Eddie created the Brite Trust, to be effective upon her death. The White Trust in the present appeal was created upon the division of the Brite Trust. As the Brite Trust's terms govern the White Trust, we recite the provisions of the Brite Trust relevant to this appeal.

The Brite Trust was composed of an undivided interest in the Ranch, a herd of approximately 1,435 Hereford cattle, ranch buildings and equipment, various investment accounts and cash, and other properties in Marfa, Texas. Eddie stated at least three times in the Will that the ranchlands were not to be sold or mortgaged during the life of the trust, but could be mortgaged if "absolutely necessary" to pay taxes on the property.[2]

The Will gave the trustee specific duties with regard to handling the trust assets, including the duty to "continue the operation of [her] ranching properties." Specifically, it gave the trustee the authority to employ the services of a general manager of the Ranch, "paying to him as wages or salary such amount as in the judgment of the trustee shall seem proper under the circumstances

---

[2] The Will gave the trustee full power to mortgage and/or sell any part of her estate "except my ranchland" and further provided that the ranchlands "shall not be sold, traded, or otherwise alienated by the trustee so long as this trust continues." It stated that the ranchlands were "to be held until this trust terminates."

and on such terms as the trustee and the proposed manager shall agree, having due regard for the proper administration of the trust," after initially consulting with Hester, Nancy, and Jane (but without requiring their agreement). The Will gave the trustee the authority to buy and sell cattle, enter into mineral leases, borrow funds for Ranch operations and mortgage any assets in the Brite Trust, save for the ranchlands themselves, and required the trustee to "keep all of the trust property in good repair." The Will provided that, if at any time it became "advantageous" to switch from ranching to farming, the trustee was entitled to either engage in farming operations or lease the land to third parties to do so for a term not to exceed the life of the trust. But the Will also contained an exculpatory clause, stating that "[t]he trustee shall not be liable or accountable to anyone for errors, if any, in judgment, and shall be required only to use good faith in the administration of this trust."

The Will provided that the Brite Trust was created for the benefit of Eddie's daughter, Hester White Vandevere; Eddie's granddaughters, Jane White and Nancy Lynch; all of Eddie's great-grandchildren living at the time of her death (which included the parties to this suit—Jim, Mac, Beau and Hester Ann—as well as certain of Nancy's children); the Brite Divinity School (the Divinity School); and the First Christian Church of Marfa (the Church). The Will further provided that during its term, 90% of the "total income" from the Brite Trust was to be paid to Hester, Jane, and Nancy, with each of them to receive 30% of the income, while the Church and the Divinity School were to receive 5% of the income each. However, the Brite Trust did not provide a method for determining the amount that would be considered the "total income." It provided only that the trustee was to pay the beneficiaries "periodically at the discretion of the trustee, but at least quarterly if such payments are reasonably feasible." The Will further provided that, upon the death of Hester, Jane, or Nancy, their descendants were entitled to receive their proportionate share of

4

income. The Brite Trust was to terminate upon the death of Eddie's last surviving great-grandchild, with the corpus to be distributed primarily to Eddie's great-great-grandchildren living at the time, through the laws of intestate succession in existence at the time, but with the Church and the Divinity School receiving 5% of the corpus each.

## B.  The 1990 clarification of the Brite Trust

On or about 1988, Hester, Jane, and three of Jane's children—Jim, Beau, and Mac—filed a petition in an El Paso District Court seeking an interpretation of the Brite Trust terms relating to how and when income was to be distributed to the beneficiaries. In response to the petition, the court entered a "Judgment Nunc Pro Tunc" in which it affirmed the income distribution percentages set forth above and clarified the manner in which the Brite Trust assets were to be distributed upon its termination. The judgment also established a plan for accounting for the principal trust assets, annual Ranch operating costs, and income to be distributed to the income beneficiaries.[3] The accounting plan included a formula for establishing a "cash deficit amount" (also referred to as the "holdback" amount) that the trustee could retain for operating expenses before making income distribution. The cash deficit would fluctuate over time depending on the economy and Ranch needs. The court's judgment required the trustee to provide information to the beneficiaries regarding the trust's financials and to make an annual income distribution to the beneficiaries in accordance with the above-described plan. In conjunction with the annual income distribution, the trustee was ordered to hold an annual meeting, which the beneficiaries could attend.

---

[3] The trial court further ordered the trustee to distribute the sum of $702,234 to the income beneficiaries, which represented the amount they would have received under the court's plan had it been in effect from the inception of the Brite Trust through calendar year 1989.

### C. The 2008 declaratory judgment creating the Jane White Trust

In 1995, Eddie's daughter, Hester, passed away, leaving behind Hester's two daughters, Jane White and Nancy Lynch, as the primary income beneficiaries under the Brite Trust. Several years later, in 2008, by agreement of the parties, an El Paso probate court issued a Declaratory Judgment in which it divided the Brite Trust into two trusts—the White Trust for the benefit of Jane and her descendants and the Lynch Trust for the benefit of Nancy and her descendants (the 2008 Declaratory Judgment). The 2008 Declaratory Judgment provided that each trust was to have assets in equal amounts. Thereafter, the property was divided such that each trust owned approximately one-half of the original Brite Ranch, or approximately 61,548 acres. The White Trust was given the operating portion of the Ranch, together with the right to keep the "Brite Ranch" name and the "bar cross brand" associated with the Ranch. The Lynch Trust was given the non-operating portion of the Ranch, as well as other properties.[4]

The 2008 Declaratory Judgment clarified that:

> Both the Lynch Trust and the [] White Trust shall continue to be administered pursuant to [Eddie's] Will, the [1990 Nunc Pro Tunc] Judgment, this Order and the Amendment approved hereby [but] [i]n the event of any conflict or inconsistency between either this Judgment or the Amendment approved hereby and either the Will or the Judgment, the provisions of this Order and the Amendment shall in all respects control and govern.

The Lynch Trust is not involved in the current litigation.

### D. Jim's employment as the Ranch general manager and appointment as Trustee

When the White Trust was first created in 2008, a local bank, which JP Morgan Chase Bank (JP Morgan) later acquired, was the sole trustee. At the time, Jim and his three siblings' father,

---

[4] The equalization of assets was accomplished in part through an exchange of property that Jane's children held in their "Children's Trusts," which Jane had previously created with property she had inherited from her mother. Jim's siblings gave Jim "power of attorney" to act on their behalf in that proceeding. In the current litigation, Mac and Beau also claimed that Jim breached his duty to disclose information to them as required by the Estate Code during that proceeding. However, because the jury did not find that Jim breached that duty, we do not elaborate on those claims.

whom we refer to as "Jim's father" for clarity's sake, served as the Ranch general manager, with Jim assisting him. After Jim's father retired, in May 2008, JP Morgan entered into a written contract with Jim to serve as the Ranch general manager. The agreement provided that Jim would receive a salary of $5,000 per month, a residence on the Ranch, payment of all utilities at the residence, groceries, a motor vehicle, a stock trailer, health insurance for him and his family, gasoline, and motor vehicle insurance. After JP Morgan resigned as trustee in December 2008, Jane White became the successor trustee and continued Jim's employment as Ranch manager under the same contract. According to Jim, Jane also hired Jim's wife and their sons (Cuatro and Clint) to work on the Ranch, but it does not appear that they entered into a formal written contract. After Jane's death in 2010, Jim became the trustee of the White Trust. Jim admittedly continued to serve as the Ranch general manager, in essence ratifying the prior written contract under which he had been hired, but without formally disclosing the contract to his siblings. He also continued to provide compensation to his family for their employment at the Ranch and continued to live on the Ranch with various family members.

## II. PROCEDURAL BACKGROUND

### A. Mac and Beau's lawsuit

On July 30, 2018, Mac and Beau filed their original petition against Jim, which they amended several times. Their Ninth Amended Petition was the live pleading in this case.[5] Mac and Beau brought their suit in their individual capacities as the named beneficiaries of the White Trust and "derivatively on behalf of the Trustee of the White Trust because the trustee cannot sue

---

[5] On Jim's motion, the trial court struck at least two provisions in the Ninth Amended Pleading; those provisions are not at issue in this appeal.

himself," complaining that Jim had not distributed any income to them since he became trustee.[6] They named Jim as a defendant, both in his individual capacity and as trustee of the White Trust. Their petition can be broken into two broad categories. First, they claimed Jim did not act as a prudent investor and did not act in the beneficiaries' best interest. Second, they claimed Jim engaged in self-dealing by hiring himself and his family to work on the Ranch for excessive compensation without disclosing the employment agreements to the beneficiaries.

### (1)  Breach of the Prudent Investor Rule

Mac and Beau listed several duties they believed Jim breached as trustee of the White Trust, including the general duties of "impartiality," "prudence," and "good faith and fair dealing," as well as the duties to administer the trust according to its terms, "make trust property productive," pay income to the beneficiaries, keep proper records, and make proper disclosures and accountings. In general, Mac and Beau's theory of liability was based on the premise that Jim was not acting in their best interest by continuing to operate the ranching business despite not generating sufficient profit to allow for income distributions.

At trial, Beau and Mac called two expert witnesses who opined that Jim had a duty to act as a prudent investor in accordance with the Prudent Investor Act, which states: "A trustee shall invest and manage trust assets as a prudent investor would, by considering the purposes, terms, distribution requirements, and other circumstances of the trust . . . [using] reasonable care, skill, and caution." Texas Property Code Ann. § 117.004(a). Among other things, the Act provides that "[a] trustee shall diversify the investments of the trust unless the trustee reasonably determines that, because of special circumstances, the purposes of the trust are better served without

---

[6] Mac and Beau also brought the petition in their capacity as trustees of their Children's Trusts, but as explained in footnote 4 above, the jury did not find that Jim engaged in any wrongdoing with respect to Mac and Beau's rights in that capacity.

diversifying." Tex. Prop. Code Ann. § 117.005. They believed Jim violated the prudent investor duty by continuing the ranching operations, positing that a reasonably prudent investor would have known after three years that ranching operations would not generate sufficient profit to allow for income distributions, which they considered the primary purpose of the White Trust. They noted, however, that Jim continued to invest in ranching operations long after that time elapsed, spending over $1.2 million in White Trust assets to purchase ranch equipment, and $1.15 million for repairs and maintenance, in addition to using approximately $2.6 million in trust assets to pay himself and his family as Ranch employees. They opined that a prudent investor would have ceased ranching operations, sold the cattle and other ranch equipment, and invested in stocks, bonds, or both. To illustrate their point, they noted that the trustee for the Lynch Trust took the prudent investor path by getting out of the cattle business and investing in the stock market, which allowed for income distributions to the Lynch Trust beneficiaries. They opined that if Jim had taken the same path and invested in the stock market, bonds, or both, there would have been sufficient profit for income distributions.[7]

During closing arguments, Mac and Beau argued that based on the experts' projections, the "sum total of the total lost profits that could have been made to the White Trust was $7,800,000." They further argued that the White Trust suffered a loss or depreciation in value of $3,776,326 during Jim's tenure as trustee, representing the investments Jim made in Ranch operations since becoming trustee.

---

[7] The experts added that ceasing ranching operations would have eliminated the need to maintain a holdback or "cash deficit amount," which was for Ranch operations; that would have allowed Jim to distribute the profits from the White Trust's investments to the beneficiaries. They indicated that the cash deficit amount was subject to being "manipulated" to a point that there would never be sufficient funds in the account to make income distributions, pointing out that debt from Ranch operations, such as from ranch equipment purchases, could be "front loaded" into the account. They stated that shortly after becoming trustee, Jim borrowed from their father's estate to continue the ranching operations and later assigned the debt to the cash deficit account, which they believed was a factor in Jim's inability to make income distributions.

### (2)  Claim of self-dealing

Mac and Beau also alleged Jim breached his "duty to not make a profit" and his "duty of loyalty," also referred to as "self-dealing," by paying himself and his family "excessive compensation" to operate the Ranch at the expense of the income beneficiaries. Specifically, they alleged Jim used White Trust assets to pay himself $5,000 a month as the Ranch general manager; pay his wife $1,200 a month for her services as the Ranch bookkeeper, and provide her a vehicle, vehicle insurance, and gas; pay Cuatro $4,500 a month for his services as operations manager, and provide him a vehicle, vehicle insurance, and a residence on the Ranch where he and his family lived, along with health insurance for him and his family, and further used Trust assets to provide runway maintenance and a free hanger storage for his wife's plane; and pay Clint $1,500 a month to do chores on the Ranch.[8] Mac and Beau also claimed Jim maintained his own herd of dairy cows on the Ranch and paid for their feed and maintenance from trust funds. According to Mac and Beau, while "the income beneficiaries of the White Trust received nothing, Jim and his family received benefits valued at over $1,000,000." Moreover, Jim's children (along with Hester Ann's children) stood to receive the assets remaining in the trust upon its termination.[9]

At trial, Mac and Beau's expert witnesses estimated that since Jim became trustee, he alone received approximately $1.16 million in salary and benefits, and he, together with his family, received a total of $2.6 million in compensation for their Ranch employment. However, both experts expressly declined to provide an opinion regarding whether the compensation Jim and his family received was unreasonable or excessive, explaining that they were retained only to address

---

[8] At trial, Jim testified that at some point after becoming trustee, he increased some of these wages.

[9] In their petition, Mac and Beau alleged they did not have any offspring who would be entitled to receive the trust assets upon its termination. But at trial, they presented evidence that they had adopted a 59-year-old man sometime after they filed their petition.

Jim's failure to act as a prudent investor and his failure to act in the beneficiaries' best interest. In addition, they agreed Jim had a duty to disclose his employment arrangements to the trust beneficiaries, which he admittedly failed to do. Mac and Beau also testified at trial that they believed Jim violated his duty to disclose the contract to them. And although Mac initially testified that he did not believe Jim received excessive compensation, he later testified that he believed Jim's salary was excessive without providing a basis for his opinion other than his belief that their father had taken less compensation when he had served as the Ranch manager.

In closing arguments, Mac and Beau argued that Jim profited in the amount of $1,165,637, based on his compensation as the Ranch general manager since becoming trustee.

### (3) Remedies sought

Globally, Mac and Beau alleged Jim acted in bad faith in his actions as trustee, either intentionally, with reckless indifference, and/or with gross negligence. They sought: (1) "derivative" damages against Jim in his individual capacity to compensate the trust for damages caused by Jim's breaches, together with exemplary damages; (2) individual compensatory damages to the beneficiaries against Jim in his individual capacity, together with exemplary damages; (3) a disgorgement of any compensation that Jim and his family had received from the trust; (4) a judicial modification of the White Trust to allow the trustee to liquidate the trust assets and sell all or any part of the Ranch; and (5) Jim's removal as trustee. They also sought attorney's fees and costs pursuant to the Texas Property Code § 114.064, to be paid by Jim individually, or in the alternative, from the trust estate.[10]

---

[10] Mac and Beau also alleged the statute of limitations was tolled, claiming Jim's wrongdoing was "inherently undiscoverable." The jury found that Mac and Beau should have discovered Jim's actions in 2016, which made their lawsuit timely filed in 2018. Jim does not dispute that finding.

## B. Jim's defense

Jim maintained that all of his actions were in good faith, and he did not breach any fiduciary duties. According to Jim, his actions were "fair and equitable to the Trust" and in accordance with its terms. Jim raised several affirmative defenses, including waiver, estoppel, unclean hands, and statute of limitations. He pointed to the exculpatory clause in the Brite Trust providing that the trustee would not be liable for errors in judgment if actions were taken in good faith, and he further relied upon the "Business Judgment Rule," which he believed protected him from liability.[11] Finally, he argued that a trust modification should be denied, as the purposes of the trust had not been fulfilled and were not impossible to fulfill.

At trial, Jim acknowledged he had continued his employment agreement and those of his family after he took over as the trustee in 2010, but he denied Mac and Beau's claim that the compensation was excessive. Jim called three witnesses on the subject.

Jim's first witness, who had been in the ranching business in West Texas for over 23 years, testified that an operations manager or foreman of a ranch in that area would be paid anywhere between $50,000 to $70,000 a year, together with various benefits to include health insurance, housing, paid utilities, a "[t]ruck, trailer, tools, and everything they needed to do the job on the ranch." He estimated a manager's assistant would generally be paid between $40,000 and $45,000 a year with similar benefits.

Jim's second witness, who owns and operates a similar cattle ranch nearby, testified that she believed the salaries Jim paid himself and his family were reasonable for the area, if not a

---

[11] "The business judgment rule in Texas generally protects corporate officers and directors who owe fiduciary duties to the corporation from liability for acts that are within the honest exercise of their business judgment and discretion." *Sneed v. Webre*, 465 S.W.3d 169, 173 (Tex. 2015).

"little bit low." She further opined that it is difficult to find employees willing to work on a remote ranch in this area and that it is often best to hire family when possible.

Jim's third witness, a board-certified attorney in estate planning and probate law with extensive experience in trust administration, testified that based on his research—which included speaking with other ranch managers in the area and the director of the ranch management program at TCU—he believed Jim's compensation package was reasonable for the area. He indicated that for ranches in remote areas, it was customary to provide a general manager the type of benefits Jim was receiving.[12] He opined that it was prudent for Jim to hire his family to assist him, pointing out that it would have been difficult to find someone to manage the Ranch given its remote location and that it was generally beneficial to hire one's own family in such a situation.

Jim's witnesses agreed Jim was doing a good job managing the Ranch, as it was making a profit despite having to pay off debts and despite years of drought in the area. Finally, Jim testified that the White Trust was on the verge of being able to make distributions to the income beneficiaries when Mac and Beau filed their lawsuit, but because of the cost of the litigation and his attorney's fees, which totaled approximately a million dollars, there were insufficient funds available to do so.

### C. Jury verdict

At the close of trial, over Jim's objection, the trial court provided the following instruction to the jury, labeled as Question One:

> **Did Defendant Jim White comply with his fiduciary duty to the Plaintiffs as beneficiaries of Jane White Trust?**
>
> You are instructed that Defendant Jim White owed a fiduciary duty to the Plaintiffs, as beneficiaries of the Jane White Trust as of April 3, 2010. To prove he complied

---

[12] Mac and Beau's own expert witness also testified that it was not unusual to provide benefits, such as housing, utilities, and fuel, to employees of ranches in remote areas.

with his duty in connection with his transactions as trustee, Defendant Jim White must show that, at the time of the transactions:

1.  The transactions in question were fair and equitable to the Plaintiffs, as beneficiaries of the Jane White Trust; and

2.  Defendant Jim White made reasonable use of the confidence placed in him by the settlor of the Jane White Trust; and

3.  Defendant Jim White acted in good faith and in accordance with the purposes of the Jane White Trust in connection with the transactions in question; and

4.  Defendant Jim White placed the interests of the Plaintiffs, as beneficiaries of the Jane White Trust, before his own and did not use the advantage of his position to gain any benefit for himself at the expense of the Plaintiffs' interests in the Jane White Trust; and

5.  Defendant Jim White fully and fairly disclosed to the Plaintiffs all material facts known to Defendant Jim White concerning the transactions in question that might affect the Plaintiffs' rights as beneficiaries of the Jane White Trust.

The court instructed the jury that for purposes of this question, "good faith" meant an action prompted by honesty of intention and a reasonable belief that the action was probably correct. The Jury answered "no" to Question One.

Question Four in three parts, asked the jury:

**What sum of money, if any, if paid now in cash, would fairly and reasonably compensate the trust estate of the Jane White Trust for the damages, if any, that were proximately caused by the conduct inquired about in Question 1?"**

The jury answered as follows:

1.  Any profit made by Defendant Jim White for his own benefit.
    ANSWER:   0
2.  Any loss or depreciation in value of the Jane White Trust estate.
    ANSWER:   $1,000,000.00
3.  Any profit that would have accrued to the Jane White Trust estate.
    ANSWER:   0

In Question 11, the jury was then instructed that if it answered "no" to Question One, it had to determine whether Jim committed an "intentional or fraudulent breach of his fiduciary duty" to Mac and Beau as beneficiaries of the White Trust. The jury answered "yes" to Question 11. Although the jury was not asked to determine whether Mac and Beau, as trust beneficiaries, suffered any actual damages from any such breach, the jury was asked "[w]hat sum of money, if any . . . should be assessed against Defendant Jim White and awarded to Beau White and Mac White as exemplary damages, if any, for the conduct found in response to Question 11." The jury responded with $1.5 million each.

In Questions Eight and Nine, the jury was asked whether Jim had violated or attempted to violate the White Trust terms (without specifying what terms were at issue). Although the jury answered "yes," it found that this did not result in any "material financial loss" to the White Trust.

Finally, the jury found that $896,513 was a reasonable and necessary amount for Mac and Beau's attorneys' legal services for the trial.[13]

### D.  Final Judgment Nunc Pro Tunc

The trial court entered a Final Judgment on August 8, 2023, followed by a Final Judgment Nunc Pro Tunc on September 26, 2023, which awarded $1 million in actual damages "on behalf of the trustee" of the White Trust against Jim individually, and exemplary damages and attorney's fees to Mac and Beau, individually, in the amounts found by the jury.[14] It further awarded $896,513 in attorney's fees to Mac and Beau, which the trial court found was a fair and equitable amount.

---

[13] The jury also entered amounts for future fees to be awarded if the matter were appealed to this Court and if the parties were to file a petition for review in the Texas Supreme Court.

[14] As explained in more detail below, the parties appear to agree that the Final Judgment Nunc Pro Tunc served as a modified or corrected judgment that supplanted the initial Final Judgment, and which governs this appeal.

15

In its Final Judgment Nunc Pro Tunc, the court ordered Jim removed as trustee "because he committed intentional breaches of fiduciary duty" and enjoined him from taking any further actions as trustee. The court determined that the "primary purpose" of the White Trust was to pay income to the beneficiaries, and that due to circumstances unforeseen by the settlor, a modification would "further the purposes of the [] White Trust." The modification divided the White Trust into four separate trusts for the benefit of each of Jane White's children, labeled the "White Division Trusts," with each child to serve as trustee of his or her own trust. The court allocated to each trust an undivided interest in the Ranch, but gave the individual trustees the right to partition and sell any of the trust assets, including the ranchlands. The trial court further declared that it was "retain[ing] continuing judicial supervision of the [] White Trust pursuant to Texas Trust Code, Section 115.001(c) until such time as all aspects of this Judgment have been fully implemented."[15]

### E. Intervenors' petition

Following entry of the original Final Judgment, but prior to the Final Judgment Nunc Pro Tunc, three of Jim's children (Eddie's great-great-grandchildren)—Cuatro, Clint, and Marti—filed a petition in intervention, alleging they had standing to intervene as contingent remainder beneficiaries of the White Trust.[16] They argued the trial court's judgment was void because they were necessary parties to the litigation and had not received statutory notice of the litigation as they believed the Trust Code required. The trial court struck the petition in intervention on Mac and Beau's motion, but not before the Intervenors filed a motion for new trial and a notice of appeal from the court's judgment.

---

[15] Trust Code § 115.001(c) provides: "The court may intervene in the administration of a trust to the extent that the court's jurisdiction is invoked by an interested person or as otherwise provided by law. A trust is not subject to continuing judicial supervision unless the court orders continuing judicial supervision." Tex. Prop. Code Ann. § 115.001(c).

[16] Jim's fourth child, Raphael White, did not join in the petition.

### F. Jim's motion for new trial and appeal

Jim also filed his own motion for new trial, in which he argued, among other things, that the first question in the jury charge had improperly placed the burden on him to show he complied with his fiduciary duties, and that the jury's answer to this improper question infected the rest of its findings as well as the trial court's Final Judgment Nunc Pro Tunc. The trial court overruled the motion, and this appeal followed.

### G. The September 3, 2023 order

After the trial court issued its Final Judgment, Jim filed a motion for instruction seeking guidance on how the White Trust's finances were to be handled, given his removal as trustee, and his inability to access funds to sustain the Ranch's ongoing operations and immediate needs.[17] On September 3, 2023, at Mac and Beau's request, and pursuant to its continuing judicial supervision over the White Trust, the trial court entered an order appointing Susan Combs as "temporary interim trustee" over the newly created Division Trusts. The order gave her power to, among other things, collect all assets of the Division Trusts, including all interests in the Ranch; to liquidate the cattle and pay debts of the Division Trusts owed to a bank in Fort Stockton; to invest and reinvest all liquid assets of the Division Trusts; and to employ persons reasonably necessary to assist in administering the estates of the Division Trusts. The September 3 Order gave Ms. Combs all the "powers of a fee simple owner" in this role.

The September 3 Order granted Mac and Beau's request for "other equitable relief," which included terminating Jim and his family's employment at the Ranch and further ordered Jim and

---

[17] In his motion, Jim explained that the White Trust's primary income came from its cattle operations and hunting leases on the Ranch, and to continue such operations, he needed access to funds to pay the Ranch employees and its vendors. Jim explained that the First National Bank of Stockton had declared a default on a line of credit the Ranch had been using for its operating costs, which was secured by 1,000 head of cattle and other Ranch assets, and there was no other source of capital from which to continue Ranch operations. He therefore sought instructions from the court on how to address the situation.

his family to cease residing at the Ranch. The trial court then severed these proceedings into a separate cause number: 7856A.

Both Jim and the Intervenors filed an appeal from that order, which is addressed in our companion opinion issued this same day in 08-23-00244-CV.

### III. ISSUES ON APPEAL

Jim and the Intervenors raise several issues on appeal, including whether the Intervenors were necessary parties to the lawsuit and whether they received proper notice of the lawsuit; whether the trial court's judgment was in accord with the jury's findings; whether the trial court's judgment was unduly vague and unenforceable; whether there were errors in the jury charge; whether there was sufficient evidence to support the jury's various findings; whether the trial court properly awarded exemplary damages to Mac and Beau; whether the attorney's fee award was proper; and whether the trial court had the authority to modify the White Trust.[18] We focus on the allegation of jury charge error, as we find it dispositive of the appeal.

---

[18] Although Jim listed the issues somewhat differently in the "Issues Presented" section of his brief, his brief addresses three global issues. Issue One is whether the final judgment contains "independent errors which are harmful and voidable (if not void)." Included within Issue One is (1) whether the final judgment "improperly found facts that should have been decided by the jury" and (2) whether the final judgment did not clearly state "for whom and against it was rendered." Issue Two is whether the jury's answers support the trial court's judgment. Included within Issue Two are nine sub-issues: (1) whether the jury charge improperly placed the burden of proof on Jim to establish that he complied with his fiduciary duties to Mac and Beau; (2) whether the trial court erred by removing Jim as trustee; (3) whether the trial court erred in granting injunctive relief prohibiting Jim from taking certain actions; (4) whether the trial court erred in awarding $1 million in damages to the trust; (5) whether the trial court's award of attorney's fees was in error; (6) whether the trial court's award of exemplary damages was in error; (7) whether the trial court erred in modifying the trust by dividing into the four Division Trusts and by permitting the sale of the ranchlands; (8) whether the trial court erred in entering a judgment to "settle all claims" with the Brite School; and (9) whether the trial court erred in awarding costs to Jim. Issue Three is whether the trial court's order is "void or voidable for the additional reasons asserted by Intervenors."

The Intervenors' brief addresses six global issues. Issue One is whether the final judgment is void because they were necessary parties to the litigation and not named as parties. Issue Two is whether the final judgment is void because they did not receive statutory notice of the litigation. Issue Three is whether the trial court abused its discretion in striking their petition in intervention. Issue Four is whether the trial court erred by modifying the Trust. Issue Five is whether the final judgment is void for failing to provide an adequate legal description of the Brite Ranch. Issue Six is whether the trial court did not follow the proper procedures for appointing a "successor trustee."

## IV. PRELIMINARY CONSIDERATION: JIM'S BRIEF

Before addressing the merits of the appeal, we address Mac and Beau's request that we "disregard" Jim's appellate brief in its entirety due to what they perceive as multiple briefing waivers.

First, they contend Jim is complaining about the trial court's original Final Judgment, rather than the Final Judgment Nunc Pro Tunc, which they contend is the operative judgment in the case. And they argue that when a party fails to challenge the appropriate judgment, he waives his complaint on appeal. Although we agree the Final Judgment Nunc Pro Tunc is the operative judgment in this appeal, Jim's brief does, in fact, address the Final Judgment Nunc Pro Tunc. We find no confusion in Jim's brief on this point.

Mac and Beau also contend Jim did not make an adequate prayer for relief in his brief as required by Rule 38.1. *See* Tex. R. App. P. 38.1(j) (an appellant's "brief must contain a short conclusion that clearly states the nature of the relief sought"). But Jim's brief asks "this Court to vacate or reverse the [trial court's] judgment and render judgment that Plaintiffs take nothing, to set aside the removal of Jim as Trustee and the modifications to the Trust and injunctive relief or alternatively modify and reduce the judgment, or in the further alternative grant a new trial." His brief therefore appears to comport with the requirements of Rule 38.1(j) in this respect.

Finally, Mac and Beau contend Jim's brief is not "clear and concise" as required by Rule 38.1, and at least one of Jim's issues is multifarious, as he raises a complaint regarding sufficiency of the evidence in the same issue as he raises a complaint regarding the jury charge error. *See* Tex. R. App. P. 38.1(i) (an appellant's "brief must contain a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record"). We recognize that it is improper for an appellant to combine complaints based on separate legal theories in a

single issue and agree that Jim did so. *See Quiroz v. Gray*, 441 S.W.3d 588, 591–92 (Tex. App.—El Paso 2014, no pet.). However, an appellate court has "the discretion to consider a multifarious issue provided it can determine, with reasonable certainty, the alleged error about which the complaint is made." *Id*.; *see also Martinez v. Martinez*, 52 S.W.3d 429, 430–31 (Tex. App.—Fort Worth 2001, pet. denied) (recognizing that although an appellate court is not required to address multifarious issues, a court is to "liberally construe briefing rules in the interest of justice" and therefore may address such issues when appropriate) (citing *Shull v. United Parcel Serv.*, 4 S.W.3d 46, 51 (Tex. App.—San Antonio 1999, pet. denied)). Here, we find that Jim has adequately briefed the issue pertaining to his jury-charge argument—despite combining it with his sufficiency argument—such that we are able to reasonably determine the nature of this point of error and address the issue in our opinion.

We therefore decline Mac and Beau's request that we disregard Jim's brief.

## V.  THE MISPLACED BURDEN OF PROOF IN THE JURY CHARGE

Turning to the merits, we focus on Jim's claim that Question One in the jury charge improperly placed the burden on him to establish that he complied with virtually all of his fiduciary duties to Mac and Beau, when he only shouldered the burden to establish that he did not engage in any self-dealing transactions that resulted in a profit to him at the expense of the trust beneficiaries. We agree that Question One improperly shifted the burden.

### A.  Standard of review

An appellate court reviews jury-charge error for an abuse of discretion. *See De Leon v. Furr's Supermarkets, Inc.*, 31 S.W.3d 297, 300 (Tex. App.—El Paso 2000, no pet.) (citing *Texas Dep't of Human Services v. E.B.*, 802 S.W.2d 647, 649 (Tex. 1990)). In determining whether a trial court abused its discretion in giving a particular jury charge, we consider "the pleadings of the

parties, the evidence presented at trial, and the charge in its entirety." *Id.* (citation omitted); *see also Island Recreational Dev. Corp. v. Republic of Texas Sav. Ass'n*, 710 S.W.2d 551, 555 (Tex. 1986). However, a trial court has "no discretion to misstate the law"; therefore, we review de novo whether a jury charge misstates the law on a controlling issue. *Meyers v. 8007 Burnet Holdings, LLC*, 600 S.W.3d 412, 421 (Tex. App.—El Paso 2020, pet. denied) (citing *St. Joseph Hosp. v. Wolff*, 94 S.W.3d 513, 525 (Tex. 2002)).

If an appellate court finds that the trial court erred in charging the jury, it may reverse the court's judgment only when the error is shown to be harmful. *See Meyers*, 600 S.W.3d at 421 (citing Tex. R. App. P. 44.1(a)(1);[19] *Union Pac. R.R. Co. v. Williams*, 85 S.W.3d 162, 166 (Tex. 2002); *Niemeyer v. Tana Oil & Gas Corp.*, 39 S.W.3d 380, 387 (Tex. App.—Austin 2001, pet. denied)). In determining whether a jury charge error was harmful, we consider whether the error, when "viewed in light of the totality of the circumstances, amounted to such a denial of the rights of the complaining party as was reasonably calculated and probably did cause rendition of an improper judgment." *De Leon*, 31 S.W.3d at 300.

### B. Applicable law: fiduciary duties, self-dealing, and burdens of proof

Although substantially related, a claim that a trustee has breached the duty of loyalty—also referred to as self-dealing—differs from other claims of breach of fiduciary duty in terms of its elements and who shoulders the burden of proof.

The elements of a breach of a fiduciary duty claim are: (1) a fiduciary relationship between the plaintiff and defendant; (2) a breach by the defendant of his fiduciary duty to the plaintiff; and (3) an injury to the plaintiff or benefit to the defendant as a result of the defendant's breach.

---

[19] Rule 44.1(a) provides, "[n]o judgment may be reversed on appeal on the ground that the trial court made an error of law unless the court of appeals concludes that the error complained of: (1) probably caused the rendition of an improper judgment; or (2) probably prevented the appellant from properly presenting the case to the court of appeals." Tex. R. App. P. 44.1(a).

21

*Gilbreath v. Horan*, 682 S.W.3d 454, 523 (Tex. App.—Houston [1st Dist.] 2023, pet. denied) (citing *First United Pentecostal Church of Beaumont v. Parker*, 514 S.W.3d 214, 220 (Tex. 2017) ("Generally, the elements of a claim for breach of fiduciary duty are (1) the existence of a fiduciary duty, (2) breach of the duty, (3) causation, and (4) damages.")). In general, to recover for a breach of fiduciary duty, a plaintiff has the burden of proving each element. *See, e.g.*, *Gilbreath*, 682 S.W.3d at 523 (recognizing that burden was on the plaintiff to establish that the defendant breached his fiduciary duties to her); *see also Wells Fargo Bank, N.A. v. Crocker*, No. 13-07-00732-CV, 2009 WL 5135176, at *3 (Tex. App.—Corpus Christi Dec. 29, 2009, pet. denied) (mem. op.) (recognizing same).

A claim of self-dealing is essentially a subset of a claim for breach of fiduciary duty, but with the additional requirement that the fiduciary used the advantage of his position to gain a benefit or profit at the expense of those to whom he owes a fiduciary duty. *See Roels v. Valkenaar*, No. 03-19-00502-CV, 2020 WL 4930041, at *6 (Tex. App.—Austin Aug. 20, 2020, no pet.) (mem. op.) (to establish "a claim for breach of fiduciary duty based on self-dealing, a plaintiff must demonstrate that the fiduciary obtained a benefit for itself either at the expense of its principal or without equally sharing the benefit with the principal") (citing *KCM Fin. LLC v. Bradshaw*, 457 S.W.3d 70, 83 (Tex. 2015) (holding that "essence" of self-dealing is fiduciary's misappropriating for itself what "would have been a shared benefit" with principal)); *see also Mims-Brown v. Brown*, 428 S.W.3d 366, 374–75 (Tex. App.—Dallas 2014, no pet.) (recognizing that "[s]elf-dealing can be generally defined as an occurrence in which the fiduciary uses the advantage of his position to gain a benefit at the expense of those to whom he owes a fiduciary duty"). Thus, there can be no finding of self-dealing in the absence of evidence that a fiduciary profited from his actions. *See Gillespie v. Hernden*, 516 S.W.3d 541, 555 (Tex. App.—San Antonio 2016, pet. denied)

(concluding that plaintiff's claim that attorney engaged in self-dealing was unsupported by the record where the evidence conclusively proved that benefit to attorney was shared equally with clients).

It is well-established that "when a plaintiff alleges self-dealing by the fiduciary as part of a breach-of-fiduciary-duty claim, a presumption of unfairness automatically arises, which the fiduciary bears the burden to rebut." *See Cluck v. Mecom*, 401 S.W.3d 110, 114 (Tex. App.—Houston [14th Dist.] 2011, pet. denied) (citing *Houston v. Ludwick*, No. 14–09–00600–CV, 2010 WL 4132215, at *7 (Tex. App.—Houston [14th Dist.] Oct. 21, 2010, pet. denied) (mem. op.); *Jackson Law Office, P.C. v. Chappell*, 37 S.W.3d 15, 22 (Tex. App.—Tyler 2000, pet. denied)); *see also Stephens County Museum, Inc. v. Swenson*, 517 S.W.2d 257, 261 (Tex. 1974) (where fiduciary was accused of engaging in a transaction for his benefit, there was a "presumption of unfairness and invalidity," and the fiduciary was required to prove that the transaction was "fair and reasonable"); *Int'l Bankers Life Ins. Co. v. Holloway*, 368 S.W.2d 567, 576 (Tex. 1963) (recognizing that a corporate fiduciary has the burden to establish the "fairness" of his transactions involving corporate property). Courts have explained that this burden requires the "fiduciary to prove (a) that the questioned transaction was made in good faith, (b) for a fair consideration, and (c) after full and complete disclosure of all material information to the principal." *Chappell*, 37 S.W.3d at 22 (citing *Stephens County Museum, Inc.*, 517 S.W.2d at 261; *Holloway*, 368 S.W.2d at 576). Thus, in cases of self-dealing, a jury charge properly places the burden on the defendant that a transaction in which he made a profit was "fair and equitable" to plaintiff, that the defendant acted in good faith and did not use the advantage of his position to gain a benefit at the plaintiff's expense, and that defendant "fully and fairly disclosed all important information" to the plaintiff concerning the transaction. *See Ludwick*, 2010 WL 4132215, at *7.

### C. Whether Jim preserved error at the jury charge conference

As explained above, Mac and Beau raised two broad categories of claims against Jim. First, they contend Jim engaged in self-dealing by paying himself and his family excessive compensation for their Ranch employment. Second, they contend Jim breached several other fiduciary duties, primarily focusing on his failure to act as a prudent investor and claiming he did not act in their best interest when he continued to invest in the cattle ranching business. In their petition, Mac and Beau appear to acknowledge they shouldered the burden of proving their claims that Jim breached his general fiduciary duties. But with respect to their claim of self-dealing, they assert the burden was "reverse[d]," and Jim therefore had the burden to prove that the compensation he received "was 'fair' to the income beneficiaries."[20]

At the jury charge conference, however, Mac and Beau proposed submitting a single question to the jury on the issue of whether Jim breached his fiduciary duties to them (which became Question One in the jury charge) asking if Jim had established that he complied with his fiduciary duties "in connection with his transactions as trustee," without specifying which transactions were at issue. In response, Jim acknowledged that Question One generally followed Texas Pattern Jury Charge 235.10, which was to be given in a case in which a trustee is accused of engaging in self-dealing, and placed the burden on the trustee to rebut the claim. *See* Pattern Jury Charges of the State Bar of Texas, Texas Pattern Jury Charges: Family & Probate PJC 235.10 (2024) (placing the burden on a trustee accused of self-dealing to establish that his "transactions" were fair, that they were made in good faith, that they were properly disclosed, and that he made reasonable use of the confidence placed in him by the settlor and did not use his position to gain

---

[20] In closing arguments, Mac and Beau expressly informed the jury that they were bringing two separate categories of claims against Jim; one for self-dealing and the other for Jim's general breaches of his fiduciary duty, again focusing on his alleged breach of the prudent investor rule, as explained by their expert witnesses.

any benefit for himself at the expense of the beneficiaries). Jim acknowledged that Mac and Beau alleged he had engaged in self-dealing with respect to the employment agreements, making Question One appropriate with respect to those transactions. However, Jim pointed out that Mac and Beau had also alleged that he breached his fiduciary duties in other respects, which did not involve self-dealing—such as his duty to act as a prudent investor—and that Mac and Beau had the burden of establishing those breaches. Jim also objected that Question One did not describe which transactions could be considered self-dealing and which could not, and a "global submission" to the jury placing the burden on Jim to establish that he complied with his fiduciary duties in connection with all of his transactions without distinction would be "confusing to the jury."[21]

In addition, Jim argued that because self-dealing requires a finding that the trustee gained a profit or other benefit, it was necessary to submit a "predicate" question asking the jury whether the trustee derived a profit or benefit from his transactions before asking the jury whether the trustee complied with his fiduciary duties with respect to the transaction.[22] Jim did not, however, submit a proposed predicate question to the trial court.

On appeal, Jim reiterates both arguments, contending: (1) Question One erroneously placed the burden on him to rebut virtually all of Mac and Beau's claims without regard to whether they involved claims of self-dealing; and (2) the trial court was required to submit a predicate question

---

[21] In making this argument, Jim referred to the comments to Pattern Jury Charge 235.10, suggesting that a jury charge on self-dealing should include a description of exactly what transaction (or transactions) are "in question." *See* Comm. on Pattern Jury Charges of the State Bar of Texas, Texas Pattern Jury Charges: Family & Probate PJC 235.10 (2024).

[22] In making this argument, Jim again referred to the comments to Pattern Jury Charge 235.10 suggesting that if there is a dispute regarding whether a trustee made a profit from any of his transactions, a predicate question may be submitted to the jury asking it to decide the issue, with the burden on the plaintiffs to establish that a profit was made. *See* Comm. on Pattern Jury Charges of the State Bar of Texas, Texas Pattern Jury Charges: Family & Probate PJC 235.10 (2024). The comments further provide that if the jury answers the predicate question in the negative, the court should not submit a self-dealing question to the jury. *Id.*

asking the jury whether it believed Jim garnered a profit from any of his transactions before submitting Question One to the jury. We agree with Mac and Beau that Jim did not preserve error with respect to his second argument, as he did not submit a proposed predicate question to the trial court. But we find that he preserved error with respect to his objection to Question One's improper burden shifting.

As Mac and Beau point out, Rule 278 provides that in general, the failure to submit a question, definition, or instruction to the jury "shall not be deemed a ground for reversal of the judgment, unless its submission, in substantially correct wording, has been requested in writing and tendered by the party complaining of the judgment[.]" Tex. R. Civ. P. 278. Thus, we agree that Jim cannot argue on appeal about the trial court's error in failing to give the jury a predicate question on whether he profited from his alleged self-dealing transactions when he did not submit a proposed predicate question to the trial court at the charge conference.[23] *See Critical Path Res., Inc. v. Huntsman Int'l, LLC*, No. 09-17-00497-CV, 2020 WL 1291327, at *9 (Tex. App.—Beaumont Mar. 19, 2020, no pet.) (mem. op.) (finding that defendant who was accused of self-dealing did not preserve error on the issue of whether the jury charge should have included a predicate question of whether he profited by his transactions where defendant did not submit a predicate question in substantially correct form in the trial court); *see also Sears, Roebuck & Co. v. Abell*, 157 S.W.3d 886, 891 (Tex. App.—El Paso 2005, pet. denied) ("If the [jury charge] error is the omission of an instruction relied on by the requesting party, three steps are required by the

---

[23] Jim also argued at the charge conference that the jury charge should include an instruction informing the jury that the trust contained an exculpatory clause, which shielded Jim from liability for errors in judgment made in good faith. However, Jim did not submit a proposed instruction to the trial court on that issue, and we therefore similarly conclude that he waived his right to argue the trial court erred by failing to provide such an instruction in the jury charge. *See Mendell v. Scott*, No. 01-20-00578-CV, 2023 WL 4712050, at *13 (Tex. App.—Houston [1st Dist.] July 25, 2023, no pet.) (mem. op.) (recognizing that "an exculpatory clause is an affirmative defense," and "[t]he failure to request a jury instruction on an affirmative defense results in waiver unless the issue was conclusively established").

Rules to preserve error: a proper instruction must be tendered in writing and requested prior to submission; a specific objection must be made to the omission of the instruction; and the court must make a ruling.").

Jim did, however, preserve his complaint that Question One improperly shifted the burden to him to rebut Mac and Beau's claims of breach of fiduciary duty, even though he did not tender a proposed question on that subject at the charge conference. On this issue, Jim is not focused on the trial court's failure to provide an instruction; instead, the focus is on whether the jury charge, as given, was improper. Texas Rules of Civil Procedure 272 and 274 provide that to preserve a jury-charge-error complaint for appellate review, a party need only make the trial court aware of the complaint in a timely and plain manner and obtain a ruling from the trial court on the complaint. *See Thota v. Young*, 366 S.W.3d 678, 689 (Tex. 2012) (recognizing that the procedural requirements "for determining whether a party has preserved error in the jury charge are explained by one basic test: whether the party made the trial court aware of the complaint, timely and plainly, and obtained a ruling"); *see also* Tex. R. Civ. P. 274 ("A party objecting to a charge must point out distinctly the objectionable matter and the grounds of the objection"); Tex. R. Civ. P. 272 (requiring objection to jury charge be made in writing or on the record before the charge is read to the jury).

Jim made it clear during the charge conference that he was objecting to Question One because it improperly placed the burden on him to establish that all of his transactions—not just those involving Mac and Beau's claim of self-dealing—complied with his fiduciary duties. We find this objection both timely and sufficiently specific to satisfy the requirements of Rule 272 and 274.

27

**D. Whether Question One improperly shifted the burden to Jim and probably resulted in an improper verdict**

We next consider whether Question One in the jury charge improperly shifted the burden to Jim on the issue of whether he breached his fiduciary duties, and if so, whether it probably resulted in an improper verdict.

Although a trust beneficiary generally has the burden of establishing that a trustee breached his fiduciary duties, the burden is reversed when the beneficiary brings a claim that the trustee engaged in a self-dealing transaction, as such alleged transactions are presumptively unfair to the beneficiary. *See Gilbreath*, 682 S.W.3d at 523; *Crocker*, 2009 WL 5135176, at *3; *Mecom*, 401 S.W.3d at 114. Here, Mac and Beau brought one claim of self-dealing: that Jim gave himself and his family "excessive compensation" for their employment at the Ranch. With respect to that particular claim, the burden is on Jim to establish that he complied with his fiduciary duties in employing and compensating himself and his family. In other words, the burden is on Jim to show that his employment agreements were fair and reasonable, that they were entered into in good faith and disclosed to the trust beneficiaries, and that he did not profit from the agreements at the beneficiaries' expense.

Question One, however, did not limit the jury to the self-dealing claim. Instead, as Jim points out, it instructed the jury that Jim had the burden to establish that "he complied with his duty in connection with his transactions as trustee," without specifying what those transactions were. While Mac and Beau alleged Jim engaged in other "transactions" in violation of his fiduciary duties (such as taking a loan from their father to invest in the ranching operations and purchasing over a million dollars in ranch equipment, which arguably violated Jim's duty to act as a prudent investor and to act in the beneficiaries' best interest) those transactions did not involve self-dealing. It was Mac and Beau's burden to establish that those transactions violated Jim's fiduciary duties

to them. Accordingly, we conclude that Question One improperly shifted the burden to Jim to establish the propriety of virtually every transaction in which he had engaged during his tenure as trustee.

In reaching this conclusion, we are mindful that, in general, broad-form jury questions are to be given when feasible. *See Crown Life Ins. Co. v. Casteel*, 22 S.W.3d 378, 390 (Tex. 2000) (reiterating the language of Tex. R. Civ. P. 277 stating that "the court shall, whenever feasible, submit the cause upon broad-form questions. The court shall submit such instructions and definitions as shall be proper to enable the jury to render a verdict."). However, as the Texas Supreme Court has recognized, when a plaintiff raises more than one theory of liability, and the jury is given a broad form jury charge asking it to determine the defendant's liability without regard to the plaintiff's separate theories, reversible error may result if an appellate court later determines that one theory was invalid or that one theory was not supported by legally sufficient evidence. *See Horton v. Kansas City S. Ry. Co.*, 692 S.W.3d 112, 139–145 (Tex. 2024). In the former situation, the Texas Supreme Court has determined that harm is presumed, while in the latter situation, it is not. *Id*. at 145–146. But in both situations, "reviewing courts should focus on the ultimate question of whether 'a review of the entire record provides [a] clear indication that the contested charge issues probably caused the rendition of an improper judgment.'" *Id*. at 146 (quoting *Thota*, 366 S.W.3d at 687).

In *Horton*, the court held that the trial court erred in providing the jury with a "broad-form negligence question" where the plaintiff alleged two theories of liability, one of which was unsupported by the evidence. *Id.* at 146–47. However, the court held that the error did not cause an improper verdict, as there was (1) "substantial evidence" in the record to support the correct

theory of liability, and (2) plaintiff's counsel primarily focused on the correct theory of liability at trial. *Id*.

Applying this harm standard to Question One, we reach a different result. Question One would have been proper had it applied only to Mac and Beau's claim of self-dealing. And we might be persuaded that Jim was not harmed by the broad form nature of Question One if Mac and Beau's focus at trial had been primarily on their claim of self-dealing and there had been substantial evidence to support that claim. But Mac and Beau neither focused on the self-dealing claim at trial, nor did they present substantial evidence to support that claim.

To the contrary, their expert witnesses focused almost exclusively on the claim that Jim did not act as a prudent investor when he continued to invest in the cattle business despite its failure to make a sufficient profit to make income distributions. Moreover, Mac and Beau's expert witnesses expressly declined to opine on whether Jim had engaged in self-dealing by paying himself and his family excessive compensation. And Mac and Beau did not present any evidence to rebut Jim's experts who testified that Jim's compensation package was reasonable under the circumstances.

We can be reasonably certain that the jury's finding in response to Question One regarding Jim violating his fiduciary duties was not based on Mac and Beau's claim of self-dealing because the jury expressly found that Jim did not profit from any of his transactions (in Question Four). While a claim of self-dealing requires a finding that the trustee gained a benefit or profit from the transaction, when assessing "the damages, if any, that were proximately caused by the conduct inquired about in Question [One]," the jury expressly found that Jim did not make any profit "for his own benefit." The jury's only finding of damages was based on its finding that there was a "loss or depreciation in value of the [] White Trust estate." As Mac and Beau argued at trial, this

loss stemmed from Jim's decision to continue investing money in the ranching operations, which they repeatedly characterized at trial as a violation of the prudent investor rule.

Because Question One improperly shifted the burden to Jim to establish that he complied with his fiduciary duties to act as a prudent investor, we conclude that this jury-charge error probably resulted in an improper verdict and Jim is therefore entitled to a new trial on Mac and Beau's claims that he breached his fiduciary duties to them. Accordingly, we sustain Jim's Issue Two with respect to his claim of jury-charge error.

### E. The charge error's impact on the trial court's decision to modify the trust

With regard to the trial court's decision to remove Jim as trustee and modify the White Trust, we conclude that the error in the jury charge and the jury's improper verdict on the issue of whether Jim breached his fiduciary duties similarly requires a reversal and new trial. As a preliminary matter, we note that although a party is entitled to a jury trial on a tort claim for breach of fiduciary duty, there is no right to a jury trial on an equitable claim to remove a trustee or to modify a trust. *See Matter of Troy S. Poe Tr.*, 673 S.W.3d 395, 412, n.12, 414–15 (Tex. App.—El Paso 2023, pet. denied, No. 23-0729, 2024 WL 3836556 (Tex. Aug. 16, 2024)); *see also Hill v. Shamoun & Norman, LLP*, 544 S.W.3d 724, 741 (Tex. 2018) (recognizing that, "[a]s a general rule, the trial court, not the jury, determines the 'expediency, necessity, or propriety of equitable relief'") (citing *State v. Texas Pet Foods, Inc.*, 591 S.W.2d 800, 803 (Tex. 1979)). But Mac and Beau did not request a separate bench trial on their equitable claims for Jim's removal or for the modification of the White Trust. Instead, they requested and received a jury trial for all of their claims. And although the jury was not asked to resolve Mac and Beau's equitable claims to remove Jim as trustee and to modify the White Trust, those claims were based on the same evidence and arguments they presented to the jury to support their tort claim, i.e., that Jim breached his fiduciary

31

duties to them, and more particularly, his duty to generate income for their benefit. In its Final Judgment Nunc Pro Tunc, the court specifically stated that its judgment was based not only on the evidence admitted at the jury trial, but on "the jury's verdict in this case" and the arguments of counsel. Accordingly, because we have already concluded that the jury's verdict that Jim breached his fiduciary duties cannot stand, we similarly conclude that the trial court's decision to grant Mac and Beau's equitable claims—which was based on that verdict—cannot stand.

We therefore conclude that Jim is entitled to a new trial on Mac and Beau's equitable claims to remove him as trustee and modify the trust. Accordingly, we sustain Jim's Issue Two with respect to his claim that the trial court erred in granting Mac and Beau's equitable claims.[24]

## VI. THE INTERVENORS' APPEAL

### A. Mac and Beau's motion to dismiss the Intervenors' appeal

Finally, we turn to the Intervenors' appeal and Mac and Beau's motion to dismiss the same. In their motion, Mac and Beau maintain that the Intervenors cannot be considered proper parties to the final judgment or to the appeal because they failed to timely petition to intervene in the trial court. We disagree.

The question of whether an intervenor can be considered a party to a final judgment, and therefore a party to an appeal, depends on whether the intervenor filed his petition in intervention before the trial court issued its judgment. In general, a party who intervenes before a trial court signs its final judgment becomes a party to the final judgment, and therefore a party to the appeal, even if the trial court later strikes the petition. *See Kenneth D. Eichner, P.C. v. Dominguez*, 623 S.W.3d 358, 362 (Tex. 2021) (recognizing that a "person who intervenes *before* the trial court signs

---

[24] Given our resolution of the dispositive issues set forth in Jim's Issue Two, we do not reach the other complaints he raises in that issue. Nor do we need to address the complaint he makes in Issue One regarding the language used in the Final Judgment Nunc Pro Tunc. *See* Tex. R. App. P. 47.1 (regarding addressing issues necessary to the disposition of the appeal and handing down an opinion as brief as practicable).

a final judgment becomes a party to that judgment") (emphasis in original); *see also Texas Mut. Ins. Co. v. Ledbetter*, 251 S.W.3d 31, 36 (Tex. 2008) (intervention before final judgment is timely). But if a person attempts to intervene in a case after the trial court has signed a final judgment, the party is not bound by the judgment and cannot be considered a "party" to the judgment or the appeal unless the trial court sets aside that judgment. *See Eichner*, 623 S.W.3d at 362 (citing *State v. Naylor*, 466 S.W.3d 783, 788 (Tex. 2015)).

Mac and Beau argue that because the Intervenors filed their petition after the trial court issued its original Final Judgment, it was too late for them to be parties to the judgment or the appeal. The Intervenors counter that because they filed their petition prior the Final Judgment Nunc Pro Tunc, they are parties. We agree with the Intervenors on this point.

In general, there can be only one final judgment in a case.[25] Tex. R. Civ. P. 301 ("Only one final judgment shall be rendered in any cause except where it is otherwise specially provided by law."). Because there may only be one final judgment, a corrected or modified judgment "supersedes the original judgment and becomes a new judgment." *In re Mittelsted*, 661 S.W.3d 639, 656 (Tex. App.—Houston [14th Dist.] 2023, orig. proceeding); *see also Abercia v. Kingvision Pay-Per-View, Ltd.*, 217 S.W.3d 688, 706 (Tex. App.—El Paso 2007, pet. denied) (recognizing that "[e]ven when a subsequent judgment differs from the original judgment only by the signature date, the subsequent judgment vacates the former judgment"); *Haase v. Deutsche Bank Nat'l Tr. Co.*, No. 01-20-00854-CV, 2023 WL 5535663, at *9 (Tex. App.—Houston [1st Dist.] Aug. 29, 2023, pet. denied) (mem. op.) (citing numerous cases for the proposition that even a nunc pro tunc

---

[25] As we have previously recognized, there are exceptions to the one-final-judgment rule in probate and receivership cases, but we are unaware of any such exceptions in trust proceedings. *Urbanovsky v. Urbanovsky*, No. 08-21-00182-CV, 2022 WL 12403922, at *2 (Tex. App.—El Paso Oct. 21, 2022, no pet.).

judgment supersedes the court's original judgment and is considered the judgment from which the parties must appeal).

Accordingly, when a trial court modifies its judgment while it still has plenary power to do so, as the court did here, the modified judgment becomes the operative judgment from which an appeal may be taken. *See Check v. Mitchell*, 758 S.W.2d 755, 756 (Tex. 1988) (recognizing that "any change, whether or not material or substantial, made in a judgment while the trial court retains plenary power, operates to delay the commencement of the appellate timetable until the date the modified, corrected or reformed judgment is signed"); *Lane Bank Equip. Co. v. Smith S. Equip., Inc.*, 10 S.W.3d 308, 310 (Tex. 2000) (citing Tex. R. Civ. P. 329b(d) in explaining that trial court has plenary power to change its judgment during period in which it retains jurisdiction over the case). Because the trial court's Final Judgment Nunc Pro Tunc superseded the original Final Judgment as the operative judgment, the petition in intervention was timely filed.

While the trial court still had plenary power of the case, on Mac and Beau's motion, the trial court struck the petition in intervention, as it had the authority to do. *See Brown v. Freed*, No. 03-21-00556-CV, 2023 WL 9007331, at *7 (Tex. App.—Austin Dec. 29, 2023, pet. denied) (mem. op.) (where record demonstrated that trial court retained plenary jurisdiction over case due to the appellant's filing of a motion for new trial, trial court had the power to strike a petition in intervention after the entry of final judgment). As the Intervenors were parties at the time, the trial court's order striking their petition was effectively merged into the Final Judgment Nunc Pro Tunc—such a merger was necessary to render the Final Judgment Nunc Pro Tunc a final, appealable judgment disposing of all claims and parties. *See Neely v. Hubbard*, No. 01-02-00160-CV, 2004 WL 35809, at *3 (Tex. App.—Houston [1st Dist.] Jan. 8, 2004, no pet.) (mem. op.) (though trial court's judgment did not properly dispose of intervenors' claims pending at the time

and was therefore not a final judgment, its subsequent order properly striking the intervenors' petition was sufficient to render its earlier judgment a final judgment).

Accordingly, we conclude that the Intervenors were parties to the final judgment and are therefore proper parties to the appeal. We deny Mac and Beau's motion to dismiss the Intervenors' appeal on the ground that they failed to timely petition to intervene in the trial court.

### B. Whether the Intervenors' appeal is moot

While the Intervenors were parties to the final judgment, we conclude that their appeal is moot given our decision to reverse and remand for a new trial.

An intervenor's appeal is limited to the question of whether the trial court abused its discretion in striking his petition. *See Smith v. City of Garland*, 523 S.W.3d 234, 239 (Tex. App.—Dallas 2017, no pet.) (citing *H. Tebbs, Inc. v. Silver Eagle Distribs., Inc.*, 797 S.W.2d 80, 88–89 (Tex. App.—Austin 1990, no writ)). A trial court's decision to strike a petition in intervention depends upon: (1) whether the intervenor has a justiciable interest in the underlying dispute, i.e., whether the intervenor could have brought the lawsuit or a portion thereof in his own name "or could have defeated recovery or some part of it"; (2) whether "the intervention would not complicate the case by excessively multiplying of the issues"; and (3) whether "the intervention is almost essential to effectively protect the intervenor's interest." *Williamson v. Howard*, 554 S.W.3d 59, 66 (Tex. App.—El Paso 2018, no pet.) (citing *Guar. Fed. Sav. Bank v. Horseshoe Operating Co.*, 793 S.W.2d 652, 657 (Tex. 1990)). The Intervenors argue that all three factors should lead us to urge us to conclude that the trial court abused its discretion in striking their petition.

Regardless of the factors pertaining to the Intervenors' position in the litigation that has already taken place, we will not speculate as to what interest they may have or how their presence will be evaluated in future litigation on remand. *See generally Patterson v. Planned Parenthood of*

*Houston & Se. Texas, Inc.*, 971 S.W.2d 439, 443 (Tex. 1998) ("Refraining from issuing advisory opinions and waiting for cases' timely factual development is . . . essential to the proper development of the state's jurisprudence."). The parties may choose to amend their pleadings on remand, or decide not to go forward with a trial at all for that matter.

Accordingly, we dismiss the Intervenors' appeal as moot in light of our decision to remand for a new trial, and we do not address the merits of the issues the Intervenors raised in their brief at this time.[26]

## VII. CONCLUSION

Because the jury charge error probably resulted in an improper verdict on the issue of whether Jim breached his fiduciary duties to Mac and Beau and the improper granting of equitable relief, we reverse the trial court's final judgment and remand this matter to the trial court to hold a new trial on Mac and Beau's legal claims as well as a new trial on their equitable claims.[27]

LISA J. SOTO, Justice

December 19, 2024

Before Alley, C.J., Palafox and Soto, JJ.

---

[26] We similarly do not reach Jim's Issue Three regarding whether the trial court's order is "void or voidable for the additional reasons asserted by Intervenors."

[27] All pending motions not specifically addressed in this opinion are denied.